The fourth district appellate court of the state of Illinois has now convened the honorable James, a connect presiding. This is our next case of the day for 19 Oh three, two, three, the people of the state of Illinois versus Dionto Deontay Johnson, uh, would the appellate please state your name? Good afternoon, your honors. My name is Simone Patras. Thank you. And for the appellee, Timothy Londrigan, your honor. We have received your motion, Mr. Londrigan and the court is disposed to grant the motion because it is an important case, but at the same time, the application of the case to the facts of this, uh, would necessitate necessitate, I think, um, providing the appellant sufficient time to respond and give us, uh, her official take on the case. How much time would you require Ms. To, uh, Jones? Yes. Um, maybe five minutes. Oh, okay. You don't feel the need to file any paper. Uh, I would like to, if your honors would like to hear me on that, I I'd like to file on paper. You may, you may do so. And of course you may, you may address it during your argument. Please remind me when we conclude to give you a date certain by which you would file whatever you choose to file. Sure. Okay. You may proceed. May it please the court council. Hi, your honors. My name is Simone Patrice and I'm from the office of the state appellate defender, and I represent the appellant down to Johnson and this matter. Your honors there. There are a few decisions that are more profound for a trial judges, as you know, then deciding to take one of the state's younger offenders and sentence them to life in prison or what to amounts to de facto life in prison. And in this case, it's, it's well established that children are constitutionally different than adults. It's it's well, that's it all agreed upon. And at this point, Deonta Johnson received a 45 year de facto life sentence for a sentence that occurred when he was in eighth grade and barely 14 years old. So at the sentencing hearing, the court did not comply with Miller and Illinois statutory law, which required it to consider Deonta's prospects for rehabilitation before sentencing him to life in prison. And while the court did acknowledge the fact that he received a GED and then he expressed remorse at the sentencing hearing, the court did not consider the fact that he had actually been a role model for youth in prison, that, that the juvenile detention unit was actually impressed with his progress and that his most recent behavioral incident was over three years prior. So in considering that in context that demonstrated that, you know, the incidents that occurred between 2010 and 2011 while numerous over time, you know, over the 10 years, he's been in prison, he actually had actually improved with his behavioral issues. And it also, you know, it didn't consider the weight of Deonta taking responsibility at the March, 2019 sentencing hearing because for the you know, some of the actions that he took as a 14 year old. So and the court did not also consider that he didn't have any failed prior failed attempts at rehabilitation. So that's important because it, it very clearly distinguished this court's decision in Stafford, you know, where they're, yes, sir. I thought your client had a pending. Robbery and aggravated battery charge against him. Is that wrong? No, your honor, that, that is in relation to the incident, the just January, 2016 incident that is, was in a jail. Okay. Well, what, what date did that, that those, uh, offenses allegedly occurred? I believe it was January, 2016. I believe, according to the record, it was January, 2016. And it was regarding Deonta, um, with, um, socks and some common commissary items. And it was in concert with another image while in detention. And that is where those charges are arising from. But again, it was over socks. And again, it occurred over three years prior. So, and before that, before the 2016 incident, the previous incident, you know, is over five years, six, sorry, my math might be wrong, but so we have a long period of time where that he's no longer engaging in this than these behaviors. Uh, so he, in January, 2016, he would have been approximately how old is it? 95, uh, 20, 21. Okay. Around 20, not yet. Cause his birthday's August, 1995. So he'll, he'll be 20 that, but, but in, but the court has also recognized that at that point, he's still, what would be qualified? And, you know, his brain was not fully developed at that time. So case law is starting to recognize the fact that, you know, your, our brains aren't fully developed until the point of 25. So at that point, it's, he's still exhibiting some of those characteristics of youth, um, and, and, and his, his going to back to his previous behaviors. However, they didn't rise to the level. I mean, your honors, it was over socks and commissary items. And again, it was one isolated incident app, and it was very brief and they weren't, there wasn't a lot of explanation as to what the specific circumstances of that really were. Um, according to the record and, you know, the court didn't actually refer to that in sentencing either. Uh, the court instead actually said that, you know, acknowledged that Dayanta was young, but then said it was clear that he should have known his actions were, you know, could not be tolerated and your honors. I don't mean to, I'm not in any way minimizing the seriousness of the offenses because the offenses were absolutely horrific and it's, you know, but the fact of the matter is that even the most heinous of crimes in accordance with Miller, you are, they're still required to consider the courts are still required to consider Hallmark fat features of youth. And in this case, the court used his, instead of diminish the Hallmark features of youth and use this to diminish his culpability. So the court again, and this is according to Illinois law, which has codified Miller. It he's the report was required to consider not just his age, but his age with any evidence of his immaturity, impetuosity, and his failure to appreciate risks and consequences. And your honors, I just submit that the court is stating. It was a trial judge on the case and it heard the evidence, but the thing is that the circumstances of the fence alone are illustrative because Dayanta was an eighth grader among 15 to 16 year olds, including his older half brother. So while the court acknowledges that there's only some evidence of peer pressure in this case from his, his brother, it's not just from his brother. It's actually that the presence of these other use of at least six other use who are actually older than him. You know, there there's evidence that this was actually Dayanta's misguided attempt to prove himself in some way to this other, to these other groups and to these peers, and considering that the court was aware of Dayanta struggles with school. You don't, and being teased that that was admitted that the first sentencing hearing for being in special education classes and the students, and that is when he started having behavioral problems, even in school. It is unsurprising that he would want to show off and, you know, in a misguided, absolutely horrific way, but to actually participate with this group think and participate with these other youths. So again, I'd, I'd submit to this court, but the court wasn't actually, the sentencing court wasn't actually considering that the weight of that. Furthermore, the record reflects that Dayanta was enrolled in special education classes and that he had a below average IQ, but in merely remarking on the presence of his mental deficiencies, the court, the court didn't actually consider how that they impacted the facts of this particular case, because it further showed that he is actually, Atkins says that people with intellectual disabilities are actually followers, they're not leaders. So now the state's, you know, suggestion and it's brief that the, he was somehow the leader and the main ring leader of this group is completely unfounded by the record because yes, your honor. Um, you began by saying that the court did not comply with Miller and Holman. I don't think you've mentioned all of them, but basically Holman gave us the criteria, but the court said it did. And normally when the trial court said it, uh, considered factors in mitigation and considered factors in aggravation, and in this case considered Miller and its progeny, we accept if the court said it did that, that it did, and so when you argue to me that the court didn't consider the Miller factors, um, that seems to fly in the face of what the trial court said that it actually did do at this sentencing hearing. That is a problem for me. How, what's your response to that? So, so my response to that is that does sound, and it's a good lead into actually what the Jones court has, has sort of hinted at. And my response to that is that actually is not, that is, this is a distinguishing situation in this case, because it is not in Illinois, in Illinois, it is not that we are just required to consider youth and its intended characteristics. It's not as if in Illinois, it's been the case that you can just say, we've considered this and it, and it is accepted that way. In fact, the first district in both Morris and in Harvey has said that, you know, mirror awareness of aging consideration, just the trial court showing that doesn't actually show that it considered prospects for rehabilitation. So Illinois courts are, are heading towards that direction of expanding those protections instead of minimizing those protections or, you know, what I'm trying to say is there's a wider under the Illinois proportional panic police calls offers more protection rather than more narrow protection. The federal federal system would offer. And counsel, if that's the case, then can you explain people versus loss fee and what, and specifically as it, uh, uh, addressed, uh, uh, rehabilitation, the defendant's prospects for rehabilitation and it's paragraphs 47, uh, through, uh, 52. And, and I'm not sure that I fully understand this, but it appears that the majority in less be simply identified what the record included, uh, which was a PSI, uh, that, uh, uh, contained information relative to, uh, the defendant's, uh, uh, youthful characteristics, uh, that, uh, they identified that the fence council had asked the court to consider the defendant's age and they concluded the majority concluded that because the trial court said it looked at everything and that it had taken into account all the statutory factors and aggravation and mitigation. Uh, that, uh, the trial court had in fact, considered the defendant's youth and its attendant circumstances and found, uh, uh, to have been Miller compliant, how is that description of, um, uh, what happened in the trial court, uh, different than what happened here? Because your honor, let's be essentially states that there are no magic words. And that, that is the read is the meaning as, as Jones points out as Montgomery and Miller pronoun that, that there is no formal factual requirement of finding permanent corrigibility for second, for instance, or finally having to say rehabilitation, but just that the proper consideration of the Hallmark attributes of youth, but what, what I'm saying here is where the record plainly demonstrates that the court did not do. So despite that, it said it did that there, the court should not be informed given entirely all of that deference. Well, so, uh, following up on justice Turner's question, and he, he pointed out that the trial judge here did, uh, indicate that he had referenced uh, uh, in, uh, uh, during the, uh, the sentencing hearing, what specifically did the trial judge say that in your opinion indicates it actually did not consider, uh, defendants. Sure. And I, I can point specifically to, um, and it's a little longer answer, but in Holman, what happened is the court cited the court didn't just rely on federal precedent to come to reach its decision and Holman. The court also cited its own precedent people versus McWilliams, which is a case from the 1930s to point out that it had long held that age is not just a chronological fact, but a multifaceted set of attributes that carry constitutional significance, as well as it cites people to point for the, for the premise that where our court remarked that it was highly if not essential to a sentencing judge's selection of an appropriate sentence, it is the possession of the fullest information possible concerning the defendant's life and characteristics. So in that, based on that reading, merely stating down to his age, that is not, that is contrary to longstanding Illinois law. It was actually required in under Illinois. We, we interpret, we choose to interpret the codification of the statute in conjunction with other factors, including these cases that the court does have to consider specific circumstances. And we choose to take a more defendant friendly approach, um, for lack of a better term at the moment. Uh, does any case that you're aware of in Illinois indicate that the trial judge has to, uh, explicitly, uh, uh, state that it had, uh, considered, uh, all of the, uh, Miller factors, uh, and provide an explanation on the record, uh, as to its analysis of those factors, or can the trial court, uh, just simply say, uh, that it has reviewed everything as it appears the trial judge did in Lusby. Uh, and, uh, that then is sufficient. No, no, your honor. I I'm not aware of a specific case that is on that exact point, but, but again, the, the Morris court and the Harvey court have found have found, and that is still good law, as far as I'm concerned, that age again, is not just a chronological fact and Illinois. And my reading, it's the death still remains to be the case and your it's not so bad it is the court was statutorily required to consider as potential for rehabilitation. That fact remains independent of whatever Jones says. So given that, that, that, that he actually, there was potential for rehabilitation, but the court just jumped to the conclusion that the offenses were so egregious. And so, you know, so outrageous that it couldn't, it didn't even consider as potential for rehabilitation. That's not the law. And that's not compliant with the, with the UC, with the, um, the criminal code, uh, with the UCC. So that is not the law. Uh, but your honors, I just like to make a comment about Jones. I'd like to turn to Jones. Um, we we'd submit that Jones has no impact on our case. It, it makes that is a narrow holding dealing with whether there has to be a incorrigibility and in this case, that's not what we're requesting that you find in this case. That has no impact. The question here isn't whether the court had to make that finding because it did. And whether it did or didn't, isn't what we're asking you to find. Um, we're asking you to find is that it didn't comply with Miller and Illinois law by considering his prospects for rehabilitation. And although it was raised admittedly, because of course it was pre Jones as a finding of permanent incorrigibility, the underlying reason for all of this, cause it's, it's a matter of words is that Deonta's rehabilitative potential is what it didn't consider. So once going through the Miller factors as part of, yes. Uh, that may have been me. I coughed. I'm sorry. I'm sorry. I don't want to talk over you. Um, so the, um, but the underlying reason rationale is the same. It's the fact that he was a role model for other youth. He had one incident in eight years. He had no failed attempts and rehab or the lengthy history. And I can find no case where the impact of peer pressure was more evident than in this case or group think. And I'm also saying that, you know, while it's not directly related again, but Holman and has never stated that it requires such a formal finding, a formal procedural finding, in other words. It's a matter of that. It's part of it's inherent in Miller and evaluating the substantive Miller factors that you would, that that would be inherent because the Holman court actually did acknowledge the Montgomery court statement that it remained hesitant to create more procedural requirements. And it was referring to the findings of fact, it didn't want to make this extra requirement. However, the Holman court still pointed out that Miller requires the court to so that states don't sentence a child whose crimes reflect transient immaturity to life without parole. And that actually two questions. You detect in Jones, the Supreme court saying that the states are free to put requirements on the imposition of the death penalty if they choose to do so. And that that's appropriate. And then I you're nodding. So I think you agree that it says that, but then my second question is, and it bothers me that the trial judge said a five-year-old would know better than this. Well, when this young man was five, he wouldn't have known better than this. And at his age, having just turned 14. And you use the word barely. I don't remember what his birthday is with an IQ of 62. That's sub-average intellectual functioning is such that he simply does not have much judgment at all in our society. I mean, it's not just his youth. It's the fact that on top of it, he's either depending upon the language of use developmentally disabled or mentally retarded. And I don't think the court understood that. I think the court understood that there was evidence that somebody said, okay, he's only got a IQ of seven 62 and he, and he goes to special ed classes, but didn't seem to factor that in to his decision when the question, but do you agree that that's a significant factor? Yes, your honor. I agree. I think that's, that, that is, that's very significant in this case because we have evidence he's operating. As a fourth to sixth grader possibly would best and that I believe, and I don't know if it was clear from the briefing, but it was fourth to sixth grader at best if making it through high school. So we're talking about somebody that, you know, the, they don't, the culpability is very important for Miller. And this is not, this is not, this is somebody that will grow up and he has grown up and he's demonstrated that he's grown up. So some of these behaviors, when the record directly states that it's related to his developmental disability, and I do your honors before I close, quickly want to touch on counsel's effectiveness for failing to present the mitigating evidence, because even if this court disagrees with everything we've just discussed, the courts have made abundantly clear that the defendant is required to present evidence of mitigation. And in this case, the psychological reports had, had, had a plethora of mitigating evidence, actually, in fact, most significantly disputing the court's finding that the, that he expressed no remorse at the time. What were the top three items in your opinion that were contained in that report that didn't make it to the sentencing hearing, what was it that the judge should have known about that he was not aware of, made specifically aware of at the time of the sentencing by counsel saying judge in the psychological report X, Y, and Z. What were those things? The three things would be the fact that he is borderline intellectual function actually is what made him, his affect made him seem that, you know, didn't express remorse at the time, which is explicitly what the court found to be an aggravating factor at the sentencing hearing. So that actually counteracted that finding. It would be the fact that he was, that the specifically said he was easily drawn into peer conflicts and that he would get aggressive when upset, and that that is dealing with the fact that his separation from his peers and the fact that he wants acceptance from his peers. And again, that, that, you know, the fact that he actually, the, the evaluation actually reflects that he didn't actually want to attend class and, you know, that corroborates his mother's findings, his mother, well, his mother's testimony that, you know, he was embarrassed. And this was a kid who had, you know, had a disability and was amongst this group of people. And, and, and this couldn't have been a matter of trial strategy to not admit that in this case. So those would be the three. Okay. Your honor, I'm out of time. So I just asked that if there are no questions that we that, you know, we stand on arguments two to four through the brief acknowledge Burge, but the PRH is still bending and Burge. And for these reasons, we ask that this court reverse his convictions, remand for a new trial or an alternative for a new sentencing hearing. Thank you. And we'll hear from your honor. Mr. Launderdale. Good afternoon, judge. How are you? This is my first zoom meeting. So I hope I don't goof it up. Uh, oral argument rather, uh, been to other zoom meetings, uh, opposing respectfully to your argument. Um, actually I think the court has made most of the major points of my argument, but I will start first, I think with judge connects observation that this particular defendant perhaps operated at a fourth to sixth level of intellectual ability, I don't know if that's the inaccurate recitation, but I'm not taking issue with that, assuming that that's correct judge. Uh, I don't think the average conduct of a fourth or sixth grader is to stomp a man that they just met moments before to death. If this individual is of an intellectual disability, which renders him a threat to society, you know, we are in the sentencing judge is responsible to protect society from this individual. And I think that's the balancing here. What the judge was required to do at the time of sentencing is to consider not only his intellectual disability and his attendant characteristics of youth, but he's also required to look at the seriousness of the crime that this individual committed and the threat that he poses to society by this condom. And we're not talking about a bunch of guys taking dad's car out for a run or stealing his liquor or something of that nature. This young man was proven to have been an instigator in this crime. And I mean by that, that he was the first to knock one of his victims off the bike. He was the first then to begin stomping on his head, whether or not he's encouraged to do so in the evidence was conflicting as to what, if any peer pressure, his was some peer pressure, even if there was some gang or group mentality, this is not the conduct of a reasonable individual, you know, Albert fourth grade, sixth grade, or whatever. He's not likely to get any better than what he is today. This is a lifetime problem. If this is a behavioral disorder, or if this is an intellectual malfunction of some kind, we are forced to deal with this individual for the rest of his life. I think the court very carefully considered what it might mean to society to allow this person back into it. I mean, it's frightening, quite honestly, to think that as a means of, from what I can gather from the evidence and sentencing, they're playing a game of knock him out, where this is just a way of passing time to come upon someone you've never met, never have any problem with whatsoever, and to stop the man to death and to do it repeatedly. The first time didn't satisfy their lust for whatever they were after. They had to do it a second time and darn near killed that individual too. So I appreciate the very difficult situation that the sentencing court must've been in. However- Mr. Londrigan? Yes, Judge. I'm sorry to interrupt you. If you get this bookmarked where you're at, but I think everybody here would agree, this is a case involving extremes, extreme violence, also extreme youth in terms of the defendant being 14 years old at the time of the offense. And so when the trial court's confronted with that and is considering the Miller factors, because I think at least the court has the discretion to consider the Miller factors, potential for rehabilitation is one of those factors. Is there any indication in the record that the trial court actually considered a defendant's potential for rehabilitation? And I'm not asking you to agree that there needed to be expressed consideration of that factor, but is there an indication in this record that defendant's prospects for rehabilitation? Well, that's a very general question, Judge. I appreciate where you're coming from, but I think if I carefully review the record again, I could probably put together a great many factors that could meet that definition. I think that the court considered his age, which is, I think, not only indicative of shallow thinking, but also potential for rehabilitation. The younger you are, the more likely you are to be rehabilitated. I think the court considered his intellectual disability. The court considered the peer pressure. The court considered his family situation. All these things, I think, add together to be a contributing factor toward rehabilitation. I think the court considered his conduct while incarcerated. The court basically considered the PSI and all the information contained within that, which I would argue addresses the rehabilitative potential of this defendant. So I think there's numerous elements that the court did consider had in front of it was available. But the most important thing, the court said it did. The court was very aware of this very issue. It was brought to the court's attention, not once, but twice in a motion for reconsideration of the sentence. And the court looks right at the case law, specifically citing Buffer and its, you know, its prodigy of Holman saying that I am considering these factors. I have read these cases. I understand they're directing me to consider these factors and I have done it. So you have the sentencing court being very clear with what it has done. And I think it's, you know, what more can we ask of it? Uh, counsel mentions, uh, Lespie in her argument, and she appropriately says that one of the issues in Lespie was that the state argued there's no magic words here. Although according to Holman, the court, the sentencing court is required to consider the five factors. The court is not required to go into any, uh, dissertation or provide any magic language that it has considered these elements. In fact, I don't, haven't found any language that suggests the court specifically has to enumerate the five factors and say that it's considered them. Although the court did so in this instance, by referring to the case law, I think it, it identified the factors and it said that it had in fact considered each one. So counsel, I noticed that the court did use the term irreparable corruption. Uh, in my view, that is a finding by the court that, uh, there can be no rehabilitation. I think that's what that language means. Do you agree with that? Absolutely judge. Yeah. I think what we're arguing here is the weight that the sentencing court gave to the various factors. I mean, I, I hear the defendant on appeal repeatedly saying that the court did not consider this or that the record plainly reflects that the court did not consider this. And I respectfully, quite strongly disagree. I think the record reflects the court did consider all those factors specifically. And I think the court came to the conclusion, although it was not required to, the court came to the conclusion that this defendant was, uh, incorrigible. And that couldn't, he could not be rehabilitated. And, you know, if we look at Dr. Jekyll's report, which the court, I think had available to it, which the court heard, I think at some point in this progress, uh, because I, I believe the same sentencing court also heard the motions to, to move this matter to adult. Well, was that, I'm sorry. I, if you could, uh, just stay on that point, because I did have a question about that. Was this the same judge, uh, uh, that, uh, considered Dr. Jekyll's report when it was, uh, brought before it for the, uh, the transfer hearing, because, uh, that the reason I consider it to be, uh, important here for this argument is whether or not, uh, uh, the, uh, sentencing judge actually was aware of that report. I think that is a counsel's one of counsel's arguments and the argument as to ineffective assistance, uh, that this specific report needed to have been, uh, uh, presented at the time of the, uh, the sentencing. So did this sentencing judge have, uh, that, uh, report? Honestly, judge, I don't know. Uh, and I hate to give you that answer. Um, I believe I recall from the record, the sentencing judge indicating that it was very much aware of this case and it had sat on this case, uh, for the pre-trial hearings, but I don't know how far back that would have gone. Uh, however, I am familiar with Dr. Jekyll's report, uh, both of them. And I don't find them at all to be supportive of defendants argument here on appeal. I think that report is very clear that this defendant poses a risk, not only to himself, but to a society as a whole. Uh, Dr. Jekyll identified, call it a personality disorder or whatever you want to call it. Uh, but indicated that although some people in their forties and fifties may overcome these issues, there's certainly no guarantee that this defendant will, and that he cannot say with any certainty whether or not this defendant will ever overcome this, that there's no treatment, uh, for the type of problem that this defendant is suffering with and the defendant poses a risk. I don't know how a sentencing court can, can be greater moved to want to protect society when given that type of testimony from a psychologist who's, you know, supposed to have the answers. And I, and I think the court, uh, cases that have dealt with this issue are also pretty clear. We just don't have, uh, that type of knowledge at this point. Uh, we can't say with any certainty, uh, whether or not individuals who suffer as this young man does are ever going to develop to where they can control these impulses and become a safe member of society, you know, the sentencing courts today are faced with, you know, intellectual or psychological problems, uh, that individuals suffer with. And they're forced to try to make this very difficult balancing decision. Do I let this guy back on the streets to murder and kill again? Or do I try to protect society from someone who I think poses and will continue for the foreseeable future, continue to pose a threat to society. And that's what this sentencing court was faced with. And I think they considered everything that they were supposed to consider and then some. Uh, they were exemplary in trying to make sure that they'd crossed all the T's and dotted the I's. They were aware of the authority cited in Lesbie, Holman and Buffer. And, you know, properly address, uh, what they were required to address. In fact, I think the Illinois, uh, and the reason I filed my motion, uh, to cite additional authority is because in light of Jones versus Mississippi, I'm misinterpreted, uh, both Miller and Montgomery, uh, in whole, it appears to me as though the Illinois Supreme court is suggesting that their interpretation of Miller requires some finding of incorrigibility. And that is specifically, uh, set aside or overruled, if you will, by Jones versus Mississippi. Uh, it it's clear that the opinions in both Montgomery and narrow and that there is no requirement whatsoever that a sentencing court, uh, make a finding of incorrigibility. In fact, in Jones, the defendant made an alternative argument suggesting that even if a factual finding of permanent incorrigibility was not required, alternatively, the sentencer must at least provide an on the record explanation, uh, with an implicit finding of a permanent incorrigibility. That argument too was rejected by the U S Supreme court in Jones. So there is no requirement. Now I agree with, again, I think it was judge connect that suggested courts are free, Illinois courts are free to add on additional requirements. They are. I agree with that interpretation of Jones. I think that language is clear. However, um, I'm wondering in light of Jones, uh, if the Illinois Supreme court might reinterpret some of its prior precedent, regardless as case law stands this afternoon, there is no requirement that the court make any on the record explanation. There is no magic language, uh, suggested in Lusby that the trial court must use or pronounce and making sure that it has addressed the five elements, um, and you know, the record is clear that the trial court was very much aware of the statutory authority, the precedent on this matter and the facts before it, and it made a difficult, but I think appropriate decision. I want to say something that it's in the form of a question, but I don't think that you'll, you'll think of it more as me making a statement and maybe there's no answer. But one of the things about developmental disability, which is the only thing that we know at this point, other than the fact that he hasn't had a good life is that the individual not only suffers some up sub average intellectual functioning, which we know that he does at least the 62 IQ would indicate that, but also an impairment in adaptive behavior. And one of the things that could suggest is at the time of these acts occurred, he was impaired and unable to conform to the rules of society. He was unable to comprehend that in order to adapt to this world, he couldn't beat people and yet his later period of time in detention and wherever he's been locked up has shown a degree of improvement. He's adapted his behavior so that he's not getting into trouble. And I don't minimize getting into trouble with other inmates is, is something that's not serious, but fighting or arguing over or stealing somebody's socks and commissary would be something that we wouldn't be, wouldn't be unexpected from someone that didn't have any mental difficulties. So you're right in a way that the retardation or the developmental disability cuts both ways. On one hand, you give him some slack because he's not functioning at his age level, but on the other hand, you asked the question that you asked, how do we know that he's telling me he's ever going to get any better? And I would suggest that there is, there are a few things in the record that show as he aged, he got better. I don't remember the date of the officer who worked with him, I think in detention, who I think wrote to the court or submitted as part of sentencing that this guy was kind of a role model and he helped other, other people. And he did things that you would say, wow, okay, that's good. That is an improvement. So again, that's a speech, I suppose, but I understand, I can't disagree with a lot of what you said and it does cut both ways, but I'd like, I'd like it better that the judge seemed to have a better understanding of what it meant to have this developmental disability. And I'm not confident that our Illinois courts have done enough to educate judges about those issues and particularly at sentencing, I think it becomes really important. Judge, I think this is an issue that's not necessarily unique to minors or, or the young group. I mean, I would point to anybody that commits heinous crimes and murders and, and you know, tortures individuals that they have something mentally wrong with them and the problem is I don't think we possess the tools to fix it. Uh, you know, we're dealing with something that, uh, we're forced to deal with, but we don't have, uh, the tools to have any assurance that this person isn't going to go out and repeat these actions and that quite frankly scares the daylights out of the public. This is fundamentally different, a case that involves a very youthful offender because Miller, the U.S. Supreme court indicated it is qualitatively different because the offender, uh, uh, is, uh, particularly prone to impulsivity as compared to an adult offender. So we can't, we can't just mix all offenders together and say, that's a criminal mind at work here. We do have a very unique, uh, uh, uh, uh, type of offender and we can't lose sight of that. Fair enough, judge. Appropriately, you know, good point. Uh, obviously that's why we're here. The Miller factors are in fact, you know, unique to juvenile offenders. Uh, and the court at Holman has indicated, you know, what criteria are to be considered with those Miller factors. Uh, again, my point would just be that the court did all that it could to address those factors. I don't think the court understood that it was required to put anything more on the record than what it did. Uh, I don't think that there's any case law out there suggesting that there is any magic language or a requirement that there'd be an on the record display of what the court was thinking. Uh, you know, let's, uh, let's be just, you know, the most recent court case on this issue, the court, as you pointed out, it just recites what was on the record, uh, what the court could have considered at the time that it's made it's a sentence and, and held that it was appropriate and constitutionally, uh, met the requirements of Miller and Holman. Uh, so I don't mean to throw up my hands and, and, uh, suggest that this defendant is not entitled to the considerations that Miller and Holman indicate that he is, uh, but I think the record also reflects that he was given those the court, uh, is left with no assurance. And I think Dr. Jekyll was pretty clear with what his, uh, observations and opinions were as well. This defendant's a risk and he's got a problem that we don't know how to fix. Thank you, Mr. Wondergren. There's nothing further. Thank you. Your further questions or speeches. Welcome to them. Judge Patras. Your honor. I'd just like to start with justice Harris's question regarding the judge on the transfer hearing, the sentencing hearing, uh, that is correct. The judge there, this is not the same judge. Um, this is judge Geisler who was at the sentencing hearing and there was a different judge on the transfer hearing. So that's why with respect to the argument regarding ineffective assistance of counsel, that it's all the more, it was all the more important in this case that that evidence be admitted and adduced, uh, and, and in a similar respect, uh, counsels, uh, you know, the state's argument now that, that, that, you know, I understand. Um, and also just because connects perspective that it's a double edged sword and that, but I just want to point out that during Dr. Jekyll's testimony and in the reports twice, he says that his diet, this isn't this diagnosis is guarded. So this wasn't an affirmative diagnosis. He definitely has antisocial personality disorder. He's definitely beyond repair. And also the context is important because that is, that was a transfer hearing and that was whether he would be released at 21 where here we're deciding whether someone should serve life in prison and at the minimum, obviously he was going to serve 26 years in prison. So the, the, the weight between the transfer hearing where he was 19 and then he could have been released at 21 versus, versus the sentencing hearing are two different contexts. So we wouldn't actually know, you know, in the context of that, what Dr. Jekyll would say with that regard. Um, and with regards to the superintendent justice connect, it was a June 2014 letter. And I just wanted to clarify that. And in terms of how do we know that Deonta has improved again, the record shows as justice connect, very thoughtfully explained that at the time the accident occurred, he demonstrated that he was unable to conform to, to society and he was unable to conform himself as you'd expect him to do by right of both his youth and his intellectual disability, but this later period of time, again, shows that he has adapted his behavior and he has made an effort. So this, this, that is what the characteristics of transient immaturity. And that's just seems to be, be what exactly what this case demonstrates. Uh, so in any event, just one moment, your honors. And I believe that that's all we'd address at this time. Uh, but I, I have one question for you, Mr. Londrigan, uh, uh, uh, indicated that, that in the Jones versus Mississippi case, the U S Supreme court, uh, didn't just say that, uh, uh, it's not necessary to repeat magic language. Um, and I'll just, but, but when, uh, uh, uh, further and indicated that there doesn't even need to be an explanation or an implicit finding, uh, as to mitigating circumstances. And I'm looking at the language here and it's exactly what Jones says. Uh, you don't need an on the record sentencing explanation or an implicit finding regarding, uh, the relevant, uh, mitigating circumstances. So if that's the case, if that's, that's what we're dealing with here. And if we don't have an Illinois Supreme court case saying that the, uh, uh, sentencing judge has to, uh, uh, state explicitly that it is considered the a detail it's a consideration of those factors. Then we get back to why wasn't it good enough here in terms of what the trial court didn't said. Well, because your honor, and I'd point out that Jones actually, in fact, in, in stating that also footnote two of the majority's opinion actually acknowledges the Montgomery court statement that, that Miller did not impose a formal fact requirement does not leave the States free to sentence a child whose crimes reflect transient and immaturity to life without parole. So with in connection to the fact that the, we're not required to list the factors, I I'm not suggesting that they necessarily are, I'm only merely suggesting that in this case, in this particular case, given the overwhelming amount of demonstrated rehabilitative potential, a mandatory factor under Illinois law, the court's statements and the court's ultimate finding doesn't reflect that it actually considered that. So that this, that given the totality of the circumstances, it wouldn't suggest that. Thank you. Okay. And, uh, your honors, um, we'd asked that there was court, uh, I saw that a question kind of come full circle in the sense that you said that we can't necessarily leave the court when the court says it did consider the Miller-Holman factors, but the court did use the language irreparable corruption. I'm looking at the, uh, reported proceedings from the motion to reconsider. The court also said it considered quote, statutory factors of aggravation and mitigation, including the defendant's age, diminished mental capacity and characteristics of youth end quote. I think you're asking this court to simply, uh, find that we don't believe what the trial court said, uh, both in the sentencing hearing and in the motion to reconsider your response. No, your honor, that, that is not what I'm suggesting. I, again, I'm suggesting that the court appeared to misunderstand what Miller stood for and what Miller and as, as codified in Illinois requires. And it required, if the court understood, didn't understand what Miller said, why did it use the words irreparable corruption and why did it refer to characteristics of youth? Your honor, it may have read those specifically, but I'm just, I'm describing in terms of his potential for rehabilitation, but that, that wasn't considered and that there was demonstrated consider potential for rehabilitation in this case. Okay. Thank you, your honors. And we'd ask that this court, uh, grant Mr. Johnson, a new sentencing hearing, or in their alternative order that he not be instructed to more than 40 years in prison. Thank you, your honors. Thank you to both counsel. Um, good arguments. We appreciate them and we'll take this matter under advisement. Thank you.